IN THE SUPREME COURT OF THE STATE OF KANSAS

Nos. 115,651
115,652

STATE OF KANSAS,
*Appellee*,

v.

KAYLA LEEANN MARTIN,
*Appellant.*

SYLLABUS BY THE COURT

A convicted criminal defendant has a statutory right to have a hearing on the question of restitution, if desired. When the defense raises a legitimate issue as to whether the restitution damages claimed by the victims were caused by the defendant's crime of conviction, the district court errs in denying the defendant's request for a restitution hearing.

Review of the judgment of the Court of Appeals in an unpublished opinion filed June 23, 2017. Appeal from Leavenworth District Court; GUNNAR A. SUNDBY, judge. Opinion filed November 16, 2018. Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is vacated and the case is remanded with directions.

*Christina M. Kerls*, of Kansas Appellate Defender Office, was on the brief for appellant.

*Todd Thompson*, county attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

JOHNSON, J.: Kayla Leeann Martin was originally charged as Kayla Leeann Connery in two separate, but related criminal cases. The district court consolidated the cases, and Martin pled nolo contendere to two counts of interfering with law enforcement by falsely reporting a crime. As part of her sentence, Martin was ordered to pay $10,800 in restitution to a couple with whom Martin and her daughter had been living at the time of the crimes. On appeal, Martin challenged the manner in which the district court imposed the restitution sentence and claimed the restitution plan was unworkable. The Court of Appeals affirmed the district court's restitution order. Determining that Martin should have been given a hearing on the restitution issue, we reverse the Court of Appeals and remand to the district court to conduct a restitution hearing.

FACTUAL AND PROCEDURAL OVERVIEW

Kayla Martin and Amy Nutsch met through a mutual friend, with whom Martin and her two-year-old daughter had been living for an unspecified period of time. Shortly thereafter, Martin confided to Amy that she had recently been raped; Martin later identified her rapist to police by name, hereafter referred to as B.T. At first, Amy and her husband, Mark Nutsch, allowed Martin to stay at the Nutsches' home during the day. Eventually Martin and her daughter moved in with them. At the time, Mark, a military officer, was away on deployment, while Amy, a middle school special education teacher, remained in Leavenworth with their four children. Amy later testified at Martin's sentencing that she had wanted to "help get [Martin] on her feet" and "make sure her daughter was well cared for . . . in a safe environment"; Amy also discussed Martin's mental health struggles, sharing that Martin had cut herself and was at times suicidal.

During her stay in the Nutsch residence, Martin sent herself threatening emails, text messages, and Facebook messages using fake accounts. Martin convinced her hosts

that the violent threats were real and that Martin, Martin's daughter, and the Nutsch family were all in danger. In response to these threats, Mark returned home from his military deployment a month early; the family installed a $4,000 security system with cameras inside and outside the home; and Amy testified her family "lived in fear for almost six months."

On September 10, 2013, a deputy with the Leavenworth County Sheriff's department responded to an alarm at the Nutsch house. At that time Martin, Martin's daughter, and the Nutsches' youngest child were the only people home. Martin told the deputy that she had seen the man who had previously raped her (B.T.) pull into the driveway in a truck. About two weeks later, in a follow-up interview, Martin told the same deputy that B.T. actually entered the house, grabbed Martin by the hair, and threatened to rape her again. Law enforcement found no signs of forced entry; the Nutsches' security cameras did not corroborate Martin's statement that anyone entered the home; and the alleged rapist, B.T., was in the custody of the Kansas Department of Corrections (KDOC) at the time of the alleged incident.

On October 29, 2013, Detective Brian Eckstein of the Leavenworth County Sheriff's department interviewed Martin about the threatening messages sent to her email account. Martin showed the detective an email message she received threatening sexual violence against her. Martin told the detective that she believed the emails were sent by B.T. A subpoena of the email carrier's records revealed that the email account was associated with a phone number assigned to Martin.

Martin also gave Detective Eckstein additional email addresses from which she claimed to have received threatening messages, but Martin did not produce any of the emails coming from these accounts. A subpoena of the email companies' records showed these addresses were either nonexistent or inactive during the relevant time period. Martin also allowed the detective to inspect her cell phone. Detective Eckstein stated, in

3

his affidavit: "The phone had text messages from 10/8/2013 to approximately 10/11/13. The data on the phone showed [Martin] forwarded the [threatening] messages to Amy but showed no incoming texts before the message was sent to Amy Nutsch."

On November 1, 2013, Martin, while alone with her daughter at the Nutsches' home, discharged a shotgun through a bathroom window. Martin told law enforcement that her brother was trying to break in through the window. Days later, Martin told Amy that on the day of the shotgun incident someone entered the house and raped her. Amy took Martin to a hospital in Atchison, Kansas, where she received a sexual assault evaluation. While at the hospital, Detective Eckstein interviewed Martin again. Martin told the detective that on the day of the shotgun incident, B.T. entered the house and raped her. The Nutsches' security cameras did not corroborate Martin's statement that her brother tried to enter the bathroom window or that B.T. entered the house. B.T., in fact, was still in KDOC custody at that time.

On December 15, 2013, Martin reported to law enforcement that she had received threatening Facebook messages from her biological mother. Detective Eckstein obtained Martin's cell phone and was able to tie it to the creation of the mother's Facebook account.

On July 9, 2014, two warrants were issued for Martin's arrest. In 2014 CR 450, the criminal complaint alleged two counts, both related to the events of September 10, 2013. The first count alleged interference with law enforcement by falsely reporting a crime (rape); the second count alleged child endangerment. The charging document in 2014 CR 449 contained three counts related to the events of December 15, 2013: interference with law enforcement by falsely reporting a crime (criminal threat); generating false information; and creating a false communication that would tend to expose another person—Martin's mother—to public hatred, contempt, or ridicule.

4

Martin reached a plea agreement in which she pled nolo contendere to both counts of interference with law enforcement by falsely reporting a crime; and the State, in turn, dropped the remaining charges.

The district court began Martin's sentencing hearing on August 19, 2015. Amy testified at the hearing regarding how Martin's actions had harmed the entire Nutsch family. In addition to the financial burdens of caring for Martin and Martin's daughter, taking measures to secure the home, and fixing damage caused by Martin firing the shotgun, Amy testified that Martin "mentally abused" her and "tried to destroy [her family]"; that Martin's actions almost destroyed Amy's marriage, relationship with her kids, and health; that Amy's four children are now "very resistant [to] trusting others . . . [and] have lost their innocence"; and that Amy needed counseling, had trust issues, and still did not feel safe in her own home.

Martin's attorney argued that much of Martin's conduct could be attributed to her mental health issues, which stemmed from her childhood and which caused Martin to believe the threats were real. Her attorney pointed out that Martin's mental health had improved through treatment and medication. In light of these considerations, Martin's attorney requested the court follow the recommendations in the presentence investigation report (PSI) and impose a presumptive probation sentence.

Martin also requested a separate restitution hearing—if the court was inclined to order restitution payments—to determine what would be an appropriate restitution amount. Amy Nutsch provided an itemized list of costs in her victim impact statement in one case. Mark Nutsch provided a different itemized list of costs in his victim impact statement in the other case. Martin requested a restitution hearing to resolve the discrepancies in Amy's and Mark's victim impact statements and to determine whether all the claimed expenses were "directly related" to Martin's crimes of conviction.

5

The district court concluded that it could not then pronounce Martin's sentence, explaining:

> "Miss Martin, either you're . . . evil or you're sick, and I don't have any evidence today . . . to determine which it is, because what you did to these folks is shameful. And I don't know if it was because of your sickness that you did these things to them or because of your evil ways of thinking, a way to get attention to yourself."

Accordingly, the court postponed sentencing and gave Martin two options. Either Martin's therapist must testify to Martin's progress, or Martin would be monitored at Larned Correctional Mental Health Facility for "three or four months" to evaluate her progress.

Additionally, the district court denied Martin's request for a separate restitution hearing, stating:

> "From the materials submitted to me, . . . there's no way I can . . . order the reimbursement of all the [Nutsches'] expenses . . . after I get income information from [Martin], which I don't have at this point, I'll make some sort of decision.

> "I don't see a restitution hearing [as] necessary because . . . [the Nutsches] may be entitled to forty, fifty-thousand dollars when I look at all the expenses, but [I will order] something less than that. So I don't need a restitution hearing."

At the continued sentencing hearing on November 13, 2015, Martin's therapist testified that Martin had been diagnosed with post-traumatic stress disorder and borderline personality disorder, and that Martin was in compliance with her prescribed treatment. After the therapist's testimony, Martin then repeated her request for the court to impose the sentence recommended in the PSI and agreed to in the plea agreement: a term of probation. She also requested that "the minimum amount of restitution, if any, be

6

ordered." Martin highlighted that she was unemployed; that she had only a high school education; that she had a young daughter in need of care; and that she had a criminal record limiting her job prospects.

The district court ordered the suspension of Martin's underlying 10-month prison sentence and placed Martin on concurrent 18-month probation terms for each conviction. The district court stated it needed to review recent Supreme Court decisions touching on the issue of what is a reasonable restitution plan. Since Martin was not currently employed, the court stated it would order restitution based on Martin's potential income, concluding that Martin was capable of earning at least minimum wage. The court stated it would issue a written restitution order within 30 days.

Martin's attorney then informed the court that the restitution order was time-sensitive because Martin turned 25 years old in 7 days—at which point she would not be eligible for the "Workforce" program. The court agreed to issue its restitution order within seven days. At the conclusion of the hearing, the court stated:

> "So I have to review those cases, consider what your potential earning income is, and make a ruling on the amount of restitution based upon the Kansas Supreme Court recent rulings in this matter.
>
> "You also have the right to appeal the sentence [in] this case.
>
> "I will have to do that within seven days to comply with the requirements of your employability."

To which Martin responded:  "Thank you."

Three days later, the district court filed a Memorandum Decision Establishing Restitution Amount. The court ruled that granting the State's request—a restitution order

7

in excess of $30,000—would not be workable. The court noted that Martin was unemployed; that it would be difficult to find employment with a felony record; that the court was unaware of any facts that would enhance Martin's future employment. However, the court also found that Martin appeared physically healthy and capable of work. Therefore, the court held Martin could reasonably earn $1,200 a month after taxes. The court held Martin should set aside 25% of her income—$300—for restitution. Furthermore, the court stated: "If she is on probation for 18 months and is extended for an additional 18 months, that would total $10,800.00. The court considers that a plan requiring payment of restitution of $10,800.00 is not unworkable, and thus restitution is ordered in [that sum]."

Martin appealed the restitution order, claiming the district court erred by declining to conduct a restitution hearing at which Martin was present and by ordering a restitution plan that was unworkable. While the appeal was pending, Martin agreed to the district court's extension of her probation for an additional 24 months. The Court of Appeals affirmed the district court's restitution order. The panel labeled the sentencing hearings on August 19, 2015 and November 13, 2015, at which Martin was present, as "restitution hearings"; it held that Martin impliedly waived the right to be present when the district court ordered the amount of restitution; it opined that, if the district court erred in proceeding without Martin's presence, the error was harmless because Martin's presence would not have had any effect on the amount of restitution ordered; and it held that Martin had failed to prove that the district court's restitution plan was unworkable. We granted review.

RIGHT TO A RESTITUTION HEARING

This court recently clarified that restitution constitutes a part of a defendant's sentence, and, accordingly, restitution must be set in the defendant's presence in open court. *State v. Hall*, 298 Kan. 978, 986, 319 P.3d 506 (2014). In that vein, Martin claims

8

that her right to be present during sentencing was violated when the restitution order was issued in a written order outside of her presence. She also contends that it was error to deny her a hearing on the amount of restitution. We take the liberty of beginning with the restitution hearing issue.

*Standard of Review*

Our standard of review varies depending upon which aspect of restitution is in issue.

> "Issues regarding the amount of restitution and the manner in which it is made to the aggrieved party are normally subject to review under an abuse of discretion standard. *State v. Hunziker*, 274 Kan. 655, 659-60, 56 P.3d 202 (2002). A district judge's factual findings underlying the causal link between the crime and the victim's loss are subject to a substantial competent evidence standard of review. *State v. Goeller*, 276 Kan. 578, Syl. ¶ 1, 77 P.3d 1272 (2003). And this court has unlimited review over interpretation of statutes. *State v. Maass*, 275 Kan. 328, 330, 64 P.3d 382 (2003)." *State v. Hand*, 297 Kan. 734, 736-37, 304 P.3d 1234 (2013).

*Analysis*

This State has a statute that provides for a hearing when a district court orders restitution as part of the sentence in a criminal proceeding. Specifically, K.S.A. 2017 Supp. 22-3424(d)(1) provides, in part: "If the verdict or finding is guilty, upon request of the victim or the victim's family and before imposing sentence, the court shall hold a hearing to establish restitution. The defendant may waive the right to the hearing and accept the amount of restitution as established by the court." In short, a convicted criminal defendant has a statutory right to have a hearing on the question of restitution, if desired.

9

Here, the two victims, Mark and Amy Nutsch, as part of their victim impact statements, asked for restitution by presenting separate itemized lists of the expenses they claimed to have sustained because of Martin's actions. Martin did not waive her right to the statutory restitution hearing and accept the itemized amounts of restitution. To the contrary, the defense specifically asked for a separate restitution hearing. In addition to pointing out discrepancies in the separate victim impact statements, the defense asked for the court to determine whether all the claimed expenses were "directly related" to Martin's crimes of conviction. In other words, the defense raised the issue of causation with respect to the claimed restitution.

The Court of Appeals opined that Martin had received her statutorily mandated restitution hearing when the district court held two sentencing hearings. The panel reasoned that Amy Nutsch testified at the first sentencing and Martin's therapist testified at the second sentencing hearing, so Martin would have had ample opportunity to be heard on restitution. That reasoning, however, does not correlate with the facts in the record.

At the first sentencing hearing, Amy Nutsch was addressing the court in connection with her victim impact statement. See K.S.A. 2017 Supp. 22-3424(e)(3) (before imposing sentence the court shall allow victim to address the court). It is questionable whether it would have been appropriate for the defense to cross-examine a victim addressing the court under those circumstances. Certainly, in this case, the sentencing judge was unlikely to have allowed such a challenge, given that the judge specifically denied a defense request for a separate restitution hearing, opining that the judge did not need anything more than Martin's income information to rule on restitution. In other words, instead of providing the defense with an opportunity to be heard on the restitution causation issue at sentencing, the district court specifically denied that opportunity.

10

With respect to the second sentencing hearing, it is difficult to intuit how the therapist's testimony on Martin's mental health could have enlightened the sentencing court about the causal link between Martin's crime of conviction and the Nutsches' claimed damages. But more importantly, as noted above, the district court had already foreclosed any further consideration of restitution, except for a consideration of Martin's ability to pay. Accordingly, the second sentencing hearing did not satisfy the purpose of a K.S.A. 2017 Supp. 22-3424(d)(1) restitution hearing.

Granted, this court has held that K.S.A. 2017 Supp. 22-3424(d)(1)'s declaration that the court "shall hold a hearing to establish restitution," is directory, rather than mandatory, language, and, thus, the failure to hold a restitution hearing is not a jurisdictional bar. *State v. McDaniel*, 292 Kan. 443, 446-47, 254 P.3d 534 (2011). Nevertheless, that does not mean that the language is purely precatory, investing the district court with unfettered discretion to deny a requested hearing. For instance, K.S.A. 2017 Supp. 21-6607(c)(2) directs a sentencing court, when placing a defendant on probation, to "order the defendant to . . . make reparation or restitution to the aggrieved party for the damage or loss *caused by the defendant's crime* . . . ." (Emphasis added.) Consequently, when the defense raises a legitimate issue as to whether the restitution damages claimed by the victims were caused by the defendant's crime of conviction, the district court must resolve that dispute by conducting a restitution hearing. In such a circumstance, the district court errs in denying the defendant his or her statutory right to a restitution hearing.

Here, both the itemized lists submitted by the victims and the sentencing hearing testimony of Amy Nutsch described claimed expenses that were incurred *prior* to the dates of Martin's crimes. At least facially, those prior expenses do not appear to have been caused by the subsequent crimes. Thus, the district court's summary holding that the appropriate amount of restitution would necessarily exceed Martin's ability to pay was apparently based upon an incorrect legal standard, i.e., the court did not limit the claims

for damages to those caused by Martin's crimes. Accordingly, we reverse that holding and remand for the district court to conduct a restitution hearing.

At the restitution hearing, the district court must first determine which of the claimed damages were caused by Martin's crimes of conviction. We recently discussed in detail the causation issue in restitution cases. See *State v. Arnett*, 307 Kan. 648, 653, 413 P.3d 787 (2018). *Arnett* concluded that the requisite "causal link between a defendant's crime and the restitution damages for which the defendant is held liable must satisfy the traditional elements of proximate cause: cause-in-fact and legal causation." 307 Kan. at 655. *Arnett* explained that "causation-in-fact requires proof that it is more likely than not that, but for the defendant's conduct, the result would not have occurred," and that legal causation limits a defendant's liability to circumstances when the risk of harm from the defendant's conduct and the ensuing results were foreseeable. 307 Kan. at 654-55.

Once the district court has established the total amount of restitution for which Martin is liable, it can proceed to assess the workability of a plan of restitution, as it did before. But this time the district court will have the guidance of *State v. Meeks*, 307 Kan. 813, 415 P.3d 400 (2018). *Meeks* was skeptical of any formulaic definition of a workable plan of restitution, stating:

> "Given the rigidity evolving from the Court of Appeals decisions, we think it is appropriate to reiterate that unworkability should be evaluated on a case-by-case basis. As we stated in *Goeller*, a defendant who argues that restitution is unworkable must come forward with evidence of his or her inability to pay. 276 Kan. at 583. District courts should use this flexible guideline to evaluate each defendant's unique circumstances before deciding whether the defendant has shown a plan would be unworkable. Some of the factors relevant to the court's inquiry will be the defendant's income, present and future earning capacity, living expenses, debts and financial obligations, and dependents. In some circumstances, the amount of time it will take a defendant to pay off a restitution order will also be relevant, especially if the defendant is subject to probation until the

12

restitution is paid in full. In all circumstances, the district court should keep in mind the ultimate goals of restitution: compensation to the victim and deterrence and rehabilitation of the guilty. See *State v. Hunziker*, 274 Kan. 655, Syl. ¶ 4, 56 P.3d 202 (2002)." *Meeks*, 307 Kan. at 820.

In sum, we reverse the Court of Appeals decision which affirmed the district court's restitution order. We vacate that part of Martin's sentence ordering restitution and remand to the district court to conduct a restitution hearing, in accordance with the guidelines set forth in this opinion. Given our decision to vacate the restitution order, the issue of the workability of the restitution plan is rendered moot.

Reversed and remanded with directions.